[No. 9421.   Department Two.   August 19, 1911.]

MILAN STILL et al., Respondents, v. PALOUSE IRRIGATION &
POWER COMPANY et al., Appellants.[1]

WATERS AND WATER COURSES—RIPARIAN RIGHTS—NATURAL FLOW
—FLOOD WATERS. A lower riparian owner is entitled to the natural
flow of the stream at regular flood seasons beneficially flooding his
lands, and can restrain the impounding of such flood waters by an
upper riparian owner, and their release during the summer months,
to his damage, where such waters are not extraordinary and un-
precedented but a usual and natural condition.

WATERS AND WATER COURSES—RIPARIAN RIGHTS—APPROPRIATION
—STATUTES. The doctrine of riparian rights for irrigation pur-
poses as to lands acquired from the government subsequent to
March 3, 1877, has not been abrogated by the act of that date (19
Stat. at L. 377), providing that surplus waters over and above
actual appropriation and use, and waters in all lakes and rivers
upon the public domain, shall remain and be free from the appro-
priation and use of the public for irrigation, mining, and manu-
facturing purposes, subject to existing right; since the act relates
only to the reclamation of desert lands.

WATERS AND WATER COURSES—APPROPRIATION — PRIORITY — DILI-
GENCE—EVIDENCE—SUFFICIENCY. An appropriation of water, prior
to the vesting of riparian rights in 1897, by the application of
water to irrigation purposes, is not established, reasonable dili-
gence being lacking, where an irrigation company first started an
appropriation in 1893, which was forfeited by the failure of the
company and abandonment of the work, and that was followed by
slight efforts toward the use of water in 1897, and an appropria-
tion and considerable diligence in 1907.

Appeal from a judgment of the superior court for Whit-
man county, Canfield, J., entered August 8, 1910, upon find-
ings in favor of the plaintiffs, after a trial on the merits
without a jury, in an action to enjoin the obstruction of the
waters of a creek used for irrigation purposes. Affirmed.

Cannon, Ferris, Swan & Lally, for appellants.

Milan Still, for respondents.

[1]Reported in 117 Pac. 466.

MORRIS, J.—It was sought in this suit to enjoin defendants from constructing and maintaining a dam across the mouth of Rock lake, for the purpose of utilizing the lake as a storage reservoir. The court below so decreed to the defendant Irrigation & Power Company, from which this appeal is taken.

Rock lake is a navigable body of water, about nine miles long and from one-half a mile to three miles wide. Its outlet is Rock creek, which flows westerly to a junction with Palouse river. Respondents are the owners of lands about ten miles west of Rock lake, through and across which Rock creek flows. The appellant company is the owner of lands bordering the mouth of the lake; also lands riparian to the Palouse river below its junction with Rock creek, and other lands still farther down in the Washtucna coulee. Respondents' lands are in four tracts, and were acquired at different times; two tracts by Federal patent in 1901 and 1902, and two by purchase from Federal grantees in 1897 and 1904. Rock creek is a small stream, but in the late winter and early spring the rains and melting snow cause the waters of the lake to rise, increasing the flow of the creek until it flows through natural channels over respondents' lands, covering in flood season about one hundred acres, which, by reason of its deposits and watering of the land at a time when the crops are dormant, is of great benefit to respondents. For the purpose of utilizing these flood waters and controlling the flow over their lands, respondents have constructed small dikes and dams across the overflow channels. They have also a small irrigating system to reach lands not covered by the overflow.

The appellant company in 1909 and 1910 constructed a dam three feet high across the mouth of the lake, its purpose being to use the lake as a reservoir for the impounding of its waters. The dam is constructed with gates, and the contemplated purpose is to leave the gates open until the flood waters of the early spring rise above the dam, when the gates will

be closed, and a body of water, three feet deep over the entire area of Rock lake, about 6,600 acre feet of water, impounded for use in the summer months, in the irrigation of appellant's lands upon the Palouse river and in the Washtucna coulee. The court below found that the erection and maintenance of this dam as contemplated by appellant would be an unreasonable detention and obstruction of the wonted flow of Rock creek over and through respondents' lands, and entered a decree accordingly.

There can be no doubt but that the scheme of appellant, if permitted to impound the waters of the lake in the spring months, would cause a serious interference with respondents' use of the waters of Rock creek, diminishing and curtailing its natural flow, wholly preventing the annual spring overflow upon respondents' lands, which is their greatest asset and factor of value, except as appellant might at its option release the waters of the lake through the gates of its dam. Such an alteration in the natural flow of a stream is not permissible. A riparian owner, such as respondents are here shown to be, has a right to the natural flow of waters in their natural and accustomed channels without diminution or alteration, subject only to the same right and use in every other riparian owner, a right that is as much included in the ownership of the land as the soil itself, and can no more be interfered with by the acts of others. And while the application of this doctrine has in some of the western states sometimes been denied, on the theory that the rules of the common law respecting riparian owners were inapplicable to conditions and necessities of the people in the particular localities where the cause of action arose, it has, since its first announcement here, invariably been upheld in this state, except where it has been subjected to a priority of appropriation. *Crook v. Hewitt*, 4 Wash. 749, 31 Pac. 28; *Rigney v. Tacoma Light & Power Co.*, 9 Wash. 576, 38 Pac. 147, 26 L. R. A. 425; *Benton v. Johncox*, 17 Wash. 277, 49 Pac. 495, 61 Am. St. 912, 39 L. R. A. 107; *New Whatcom v. Fairhaven Land Co.*,

24 Wash. 493, 64 Pac. 735, 54 L. R. A. 190; *Madson v.
Spokane Valley Land etc. Co.*, 40 Wash. 414, 82 Pac. 718, 6
L. R. A. (N. S.) 5; *McEvoy v. Taylor*, 56 Wash. 357, 105
Pac. 851, 26 L. R. A. (N. S.) 222.

The contemplated detention of the waters of Rock creek,
through their impounding in the lake, practically amounts
to a total detention at unknown times, when, with their natu-
ral spring flow, they would be serving their best purpose to
respondents.    Water may not thus be gathered into reser-
voirs for future use, when it may best suit the convenience
and use of one riparian owner, and thus deprive other ri-
parian owners of their use and service of the stream in its
natural condition, unless such right is exercised under a valid
prior appropriation.    *Monroe Mill Co. v. Menzel*, 35 Wash.
487, 77 Pac. 813, 102 Am. St. 905, 70 L. R. A. 272.

Appellant purposes to release these waters in August or
September, when they will be used to increase the natural flow
of the Palouse river.    Rock creek through respondents' lands
can only accommodate about one hundred cubic feet of water,
and to permit these waters to then be released and flood the
creek above its summer level would mean an overflow of its
waters upon respondents' lands when they were in crop, with
its consequent damage.    Appellant insists that it is only
using waste waters, and that it has the right to use the so-
called flood waters, citing *Edgar v. Stevenson*, 70 Cal. 286,
11 Pac. 704; *Modoc Land & Live Stock Co. v. Booth*, 102
Cal. 151, 36 Pac. 431, and *Fifield v. Spring Valley Water-
works*, 130 Cal. 552, 62 Pac. 1054—California cases, holding
that a lower riparian owner who is not injured by the diver-
sion of flood waters above his land cannot restrain such di-
version.    The reasoning of those cases is that the lower owner
is only entitled to the natural flow of the stream; and so long
as he continues to have such natural flow undiminished and his
use of the water is not interfered with, he cannot complain,
having suffered no damage.    The water diverted in those

cases was during times of extraordinary flood or freshets, and was water never used by the lower owner. Nor was his use diminished or interfered with.

Where, however, as in this case, annual floods have caused streams to overflow from time immemorial, and such overflow has spread over lands, enriching and fertilizing them with its deposits, the California courts have invariably held that such waters were not subject to impounding by the upper owner, and that they were not extraordinary and unusual waters, within the meaning of *Edgar v. Stevenson* and like cases. In *Miller & Lux v. Madera Canal & Irr. Co.*, 155 Cal. 59, 99 Pac. 502, 22 L. R. A. (N. S.) 391, a case very similar to the one before us, it is said:

"There is no good reason for saying that the greatly increased flow following the annually recurring fall of rain and melting of snow in the region about the head of the stream is any less usual or ordinary than the much diminished flow which comes after the rains and the melted snows have run off."

Again:

"It cannot be said that a flow of water, occurring as these waters are shown to occur, constitutes an extraordinary and unusual flow. In fact, their occurrence is usual and ordinary. It appears that they occur practically every year and are reasonably expected to do so, and an extraordinary condition of the seasons is presented when they do not occur; they are not waters gathered into the stream as the result of occasional and unusual freshets, but are waters which on account of climatic conditions prevailing in the region where the Fresno river has its source are usually expected to occur, and do occur."

Gould on Waters, § 211, is cited, where it is said that:

"Ordinary rainfalls are such as are not unprecedented or extraordinary; and hence flood and freshets which habitually occur and recur again, though at irregular and infrequent intervals, are not extraordinary and unprecedented. It has been well said that 'freshets are regarded as ordinary which

are well known to occur in the stream occasionally through a period of years though at no regular intervals.' "

To the same effect are: *California Pastoral etc. Co. v. Enterprise Canal & Land Co.,* 127 Fed. 741; *Heilbron v. Fowler Switch Canal Co.,* 75 Cal. 426, 17 Pac. 535, 7 Am. St. 183.

In this case the respondents do make use of these high waters, and the greatest use and benefit to their land comes from such use. Rock creek commences to rise in cold weather, and continues to rise gradually and very slowly, until the spring rains or a thaw increases its volume of water. It commences to overflow respondents' lands in January, and continues until late in March or April, when it gradually recedes, until about July it has left the lands. Respondents then commence their irrigation of the lands not overflowed, and irrigate in July, August, and September. So that they make a constant use of these waters from January to September. If the high waters of winter are impounded by appellant's dam, respondents will be deprived of a very material and beneficial use of these waters; in fact, their greatest and most beneficial use. They will be withheld from them in the early spring when required for the irrigation of their crops, and released in August and September when any overflow would be detrimental to their crops. This condition of Rock creek is not an extraordinary or unusual condition. It is a natural condition. With the exception of the fall months, the creek is either rising or falling, and we can see no reason why the use of the creek in its rise is not as much a use of its natural and ordinary condition as its use when its waters are receding. That respondents have this right to the overflow seems unquestioned, a right that is as clear as any riparian right can be.

"The right which a party has to the use of water flowing over his own land is undoubtedly identified with the realty, and is a real or corporeal hereditament." *Cary v. Daniels,* 5 Met. (Mass.) 236.

It is next contended that the doctrine of riparian rights, except as to water for domestic purposes, has been entirely abrogated as to all lands through which nonnavigable streams flow, the title to which has been acquired from the government of the United States subsequent to the act of Congress, approved March 3, 1877 (19 Stats. at Large, 377), providing, among other things:

"And all surplus water over and above such actual appropriation and use, together with the water in all lakes, rivers, and other sources of water supply, upon the public lands and not navigable shall remain and be held free for the appropriation and use of the public for irrigation, mining, and manufacturing purposes subject to existing right."

This contention has been suggested by two Oregon cases, *Williams v. Altnow*, 51 Ore. 275, 95 Pac. 200, 97 Pac. 539, and *Hough v. Porter*, 51 Ore. 318, 95 Pac. 732, 98 Pac. 1083, 102 Pac. 728. The act itself manifestly relates only to the reclamation of desert lands and confines the use of the water to the amount "actually appropriated and necessarily used for the purpose of irrigation and reclamation;" such right to be determined by *bona fide* prior appropriation. As to such lands, Congress recognized and assented to the appropriation of water in contravention of the common-law right of the lower riparian owner to insist on the continuous flow of the stream. This court has always recognized the doctrine of prior appropriation of water on public lands as superior to all other claims, while it has also recognized the common-law right of the riparian owner against all but *bona fide* prior appropriators. *Benton v. Johncox*, 17 Wash. 277, 49 Pac. 495, 61 Am. St. 912, 39 L. R. A. 107; *Sander v. Wilson*, 34 Wash. 659, 76 Pac. 280. None of the lands now owned by respondents and riparian to Rock creek were settled upon or claimed as desert lands under the act of 1877. Nor does any right attach to such lands by virtue of such act. Neither can we find any valid and existing appropriation of this water by appellant or any grantor prior to the vesting

of riparian rights in respondents in 1897; although several attempts to make a valid appropriation had been made prior to that time, under which appellant claims. These appropriations extend as far back as 1892, but it does not appear that the appropriators have employed such diligence in carrying out their irrigation projects as to keep their appropriation alive. Nor have they diligently and continuously prosecuted their scheme to completion, as provided in Rem. & Bal. Code, § 6318. The extent of their labors in this regard is found by the court below in its memorandum opinion:

"In 1892 surveys were made; in 1893 a dam was constructed and twelve miles of ditch dug; in the winter of 1893 part of the dam was taken out; in 1894 the company went into the hands of a receiver. The receivership lasted two years, during which time no extension was made of the work and the only work done was some effort to stop the decay of property. The extent of this effort is not shown. In 1897 another dam was built which went out the following winter. In 1898 they irrigated a tract of forty acres; in 1902 they irrigated twenty acres. From 1904 to 1906 no irrigation whatever. In 1897 part of the head works washed out, which were not replaced until 1907. In 1906 defendant Peters purchased the project, which was then unused and out of repair, and six months later transferred it to defendant company, which began construction, built a dam and head works, and has prosecuted its work with diligence and is now irrigating three hundred acres. This testimony establishes not an appropriation and continuous prosecution of the work of applying the water to a beneficial use, but three several appropriations: First, in 1893 an appropriation which was forfeited by the failure of the company and abandonment of the work; second, an appropriation and slight efforts toward the use of the water in 1897; third, an appropriation and considerable diligence by this defendant in 1907."

These facts, justified by the record, amply sustain the court's holding that there was no valid and existing prior appropriation prior to the assertion of respondents' rights in 1897, in that it lacks the necessary element of an accompanying reasonable diligence in the prosecution of the work.

*Offield v. Ish*, 21 Wash. 277, 57 Pac. 809. Nor was the appropriation confirmed by the "continuous use of the water for irrigation thereafter, and the extension of the area of cultivation with reasonable diligence," as referred to in *Longmire v. Smith*, 26 Wash. 439, 67 Pac. 246, 58 L. R. A. 308.

"There must be diligence in prosecuting the construction work. This was a requisite from the earliest days for all appropriators claiming the benefit of the doctrine of relation, and remains to the present day wherever the law of appropriation is in force." Wiel, Water Rights, § 124.

It is true, as suggested by appellant, that enterprises of this character cannot be completed all at once, and that some element of time must elapse between its inception and its completion. There can, however, be such an exercise of diligent effort to complete the scheme, and such a use of water as to definitely indicate a purpose to continue its use, and to persevere to the final accomplishment of the project, such as is not shown by this record to have occurred between the appropriations of 1892 and 1893, and the condition of the project when this suit was instituted. The original appropriation in 1892 was to take 10,000 cubic feet of water per second. The next was for 5,000 cubic feet per second. And the extent of the use was the irrigation of forty acres in 1898. In 1902 the use had dropped to twenty acres, and from 1904 to 1906 no irrigation at all. Nor was there any attempt to repair the headgate, washed out in 1897, until 1907. We can find no diligence with such a record, and nothing that indicates anything other than an abandonment. If not an abandonment, it was certainly not such a continuous use as to amount to a *bona fide* appropriation against the rights of others, diligently and continuously used and asserted.

Concurring with the court below in its finding and conclusions, the judgment is affirmed.

CROW, ELLIS, and FULLERTON, JJ., concur.